**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ana Marie Childs,<br><br>        Plaintiff,<br><br>vs.<br><br>Carolyn W. Colvin,<br>Acting Commissioner of Social Security,<br><br>        Defendant. | No. CV-12-0032-TUC-BGM<br><br><br><br>**ORDER** |

Currently pending before the Court is Plaintiff's Opening Brief (Doc. 21). Defendant filed her response (Doc. 27), but Plaintiff did not reply. Plaintiff brings this cause of action for review of the final decision of the Commissioner for Social Security pursuant to 42 U.S.C. § 405(g). The United States Magistrate Judge has received the written consent of both parties, and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure. The Court takes judicial notice that Michael J. Astrue is no longer Commissioner of the Social Security Administration ("SSA"). The Court will substitute the new Acting Commissioner of the SSA, Carolyn W. Colvin, as Defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

**I.    BACKGROUND**

    *A.    Procedural History*

On April 11, 2008, Plaintiff filed an application for Supplemental Security Income ("SSI") alleging disability as of January 1, 1994 due to rheumatoid arthritis and depression.

*See* Administrative Record ("AR") at 19, 21, 111, 153. The Social Security Administration ("SSA") denied this application on July 8, 2008. *Id.* at 19, 61. Plaintiff filed a request for reconsideration, and on October 20, 2008, SSA denied Plaintiff's request. *Id*. at 19, 65, 68. On October 27, 2008, Plaintiff filed his request for hearing. *Id.* at 19, 72. On August 19, 2009, a hearing was held before Administrative Law Judge ("ALJ") Peter Baum. *Id*. at 19, 35-58. The ALJ issued an unfavorable decision on January 25, 2010. AR at 16-28. Plaintiff requested review of the ALJ's decision by the Appeals Council, and on November 7, 2011, review was denied. *Id.* at 1-4, 13. On January 11, 2012, Plaintiff filed this cause of action. Compl. (Doc. 1).

### B. Factual History

Plaintiff was forty-three (43) years old at the time of the administrative hearing, and forty-two (42) at the time of the alleged onset of her disability. AR at 26, 37-39, 105, 111, 116, 118, 134, 150. Plaintiff possesses an eleventh grade education and obtained a GED at the time of her alleged onset. *Id.* at 39. Prior to her alleged disability, Plaintiff was the primary caregiver to her disabled father. *Id.* at 26, 121-22. Plaintiff cared for her father twenty-four (24) hours per day, seven (7) days per week. *Id.* Caring for her father included preparing all meals, talking to him, watching movies, bathing, shaving, general hygiene and cleaning his clothes. *Id.* at 122. If her father fell, Plaintiff would help him up. AR at 122. Plaintiff further supervised her children in assisting with her father's care. *Id.*

At the administrative hearing, Plaintiff testified that she has not looked for work, "because a lot of it is walking and I get tired very easily and it takes me longer to get someplace[.]" *Id.* at 40. Plaintiff further testified that she has to "sit down all the time." *Id.* at 40. When asked if she could perform a simple, sit-down job, Plaintiff testified that she could not, because her hands and feet "get numb" and she can only sit for approximately half an hour before needing to stand and change positions. *Id.* at 41-43.

Plaintiff testified that she normally uses a cane when she walks, and uses it in her right hand, because she has not strength in her left hand. AR at 41-43. Plaintiff further testified

that she is able to tie a pair of shoelaces, but she usually wears something that she can slip on and a pullover blouse (without buttons) and no belt. *Id.* at 42. Plaintiff testified that she does not drive because her feet go numb. *Id.* at 42-43. Plaintiff further testified that her problems with her legs has been gradually getting worse. *Id.* at 43-44.

Plaintiff testified regarding her current weight, which was approximately forty (40) pounds lighter than what her medical records reflect; however, Plaintiff further testified that her clothes do not feel much looser than they were previously. *Id.* at 44. Plaintiff testified that she had a little difficulty walking down the hallway to the courtroom. AR at 45. Plaintiff also testified that she has trouble breathing. *Id.* Plaintiff testified that walking, climbing stairs, dust, humidity, and heat all make it more difficult for her to breathe. *Id.* at 46.

Plaintiff denied using marijuana during the last year. *Id.* at 46-47. Plaintiff testified that one of her kids had suggested that she drink it in a tea; however, her doctor said it was illegal and would cause the pharmacist to start questioning her medication. *Id.* at 47. Plaintiff further testified that for that reason, she did not use the tea. AR at 47. Plaintiff testified that in the last year and a half she only drank one time, celebrating with her son when he got out of prison. *Id.* at 48. Plaintiff testified that she has two girls, one daughter and one granddaughter, living with her. *Id.* They are fourteen (14) and thirteen (13) respectively. *Id.*

Mr. Nathan Dean, a vocational expert, also testified at the administrative hearing. AR at 50. The ALJ asked Mr. Dean, hypothetically, whether an individual of claimant's age, education, and no work history with mental limitations including moderately limited in her ability to maintain attention, concentration for extended periods, ability to set realistic goals, and make plans independently; able to meet all of the basic mental demands of competitive, remunerative, unskilled work including the ability to understand, remember, and carry out simple instructions; to make simple work-related decision; maintain a simple schedule; and complete simple tasks on a consistent basis; to work with and around others; to deal with

- 3 -

1 changes in a routine work setting although she is likely to benefit from some vocational 2 guidance having never worked outside the home; and with the physical restriction of 3 sedentary level of exertion; uses an assisted device (cane) in her right dominant hand; can 4 be on her feet for up to four hours in a workday, but no more than that; has no restrictions 5 on sitting; could frequently reach, handle, or feel, occasionally climb ramps and stairs, stoop, 6 or kneel, she should never climb ladders, ropes or scaffolds, or crouch or crawl during the 7 course of work; she should not be exposed to temperature extremes or to concentrated 8 airborne irritants such as dust or fumes or gases could sustain any sedentary work. *Id.* at 51- 9 53. Mr. Dean opined that Plaintiff would be able to perform such sedentary work, including 10 sedentary, unskilled jobs such as food and beverage order clerk, charge account clerk, and 11 a telephone quotation clerk. *Id.* at 53-54.

12 The ALJ questioned Mr. Dean regarding the national publication not talking about 13 someone using a cane in their right dominant hand or their limits and adaptability mentally. 14 *Id.* at 54. Mr. Dean acknowledged that the national publications do not address those issues, 15 and as such cannot be accurately applied in this case. *Id.* As such, the ALJ asked whether 16 Mr. Dean was familiar with these jobs as the are performed in the State of Arizona. AR at 17 54. Mr. Dean testified that he was familiar with food and beverage clerk as performed in the 18 State of Arizona, and his opinion was that Plaintiff could perform such a job. *Id.* at 54-55. 19 The ALJ asked Mr. Dean a second hypothetical, if Plaintiff was limited to being seated for 20 no more than thirty (30) minutes before her feet and hands went numb, would she be able to 21 sustain the food and beverage clerk job or any other job. *Id.* at 55. Mr. Dean testified that 22 Plaintiff could not. *Id.*

23 Plaintiff's attorney asked Mr. Dean whether Plaintiff could sustain the food and 24 beverage order clerk job if she has social limits, concentration, and persistence and pace at 25 a moderate level. AR at 56. Mr. Dean testified that she could not. *Id.*

26 Pursuant to request by Arizona Department of Economic Security ("AZDES"), 27 Plaintiff was referred for evaluation by Noelle Rohen, Ph.D. and examined on June 16, 2008.

28
- 4 -

1 *Id.* at 170. Dr. Rohen reviewed Plaintiff's medical records provided by Disability
2 Determination Services, performed a clinical interview and mini-mental state examination.
3 *Id.* Dr. Rohen diagnosed Plaintiff with major depressive disorder, recurrent, chronic, severe,
4 and pain disorder associated with both psychological factors and a GMC. *Id.* at 172. She
5 deferred to Plaintiff's medical records regarding physical diagnoses. AR at 172. Dr. Rohen
6 described Plaintiff to be "dressed casually but appropriately for the appointment. *Id.* at 171.
7 Moreover, "[h]ygiene and grooming appeared to be basic but adequate." *Id.* Plaintiff's
8 "[e]ye contact was fair[,]" and she was "generally cooperative[.]" *Id.* Dr. Rohen noted
9 Plaintiff's [a]ffect was flat, she spoke in a soft voice, and she offered limited content in her
10 responses[,] [and her] [s]peech rate was [within normal limits]." *Id.* Although Plaintiff's
11 "[m]otor activity was retarded," her "[t]houghts were linear and coherent [and] [h]er fund of
12 knowledge was estimated to be average." AR at 171. Dr. Rohen determined that Plaintiff
13 "achieved a score of 27 out of a possible 30 on the exam, and was found to be alert and
14 oriented except to day of the week." *Id.* Dr. Rohen further stated that Plaintiff
15 "demonstrated concrete abstracting ability through determination of item similarity, and
16 performed within normal limits on tasks requiring simple calculations." *Id.* Dr. Rohen noted
17 that Plaintiff had difficulty maintaining set on a serial subtraction task, but succeeded in
18 reversing the spelling of a common word, and erred in repeating a short phrase; however,
19 intermediate and remote memory processes appeared intact and mild attentional disruption
20 was suggested. *Id.* at 171-73. Dr. Rohen concluded:

21 > Ms. Childs presents with history of chronic depression in the context of a
22 > lifetime of self-sacrifice, caring for her disabled father at the expense of
> developing her own career and social life. Her father has recently died and she
> misses him terribly, and probably feels a bit lost now that her major lifelong
23 > responsibility has been lifted. She is also in pain from her R.A., presumably
> exacerbated by her emotional pain. Psychiatric conditions are expected to be
24 > chronic with guarded prognosis, and to impact her ability to work[.]

25 *Id.* at 172. Ultimately, Dr. Rohen assessed Plaintiff's understanding and memory as intact;
26 her sustained concentration and persistence adequate for interview with mild attentional
27 difficulties; social interaction impaired by flat affect and lack of spontaneity in verbal or
28

- 5 -

1  emotional expression; and adaptation that is affected by grief, but allows her to get around
2  town via the city bus and make decisions independently. *Id.* at 173.

3  Pursuant to request by the AZDES, Plaintiff was examined by Dennis Thrasher, M.D.
4  *Id.* at 175-81.  Plaintiff saw Dr. Thrasher on June 17, 2008.  AR at 175.  Dr. Thrasher
5  reviewed Plaintiff's medical records, interviewed her and performed a physical examination.
6  *Id.* at 175-81.  Dr. Thrasher's assessment indicated a history of rheumatoid arthritis,
7  hypertension, asthma and depression. *Id.* at 175-77.  Dr. Thrasher found that Plaintiff could
8  lift and carry up to ten (10) pounds frequently and up to twenty (20) pounds occasionally.
9  *Id.* at 178.  In an eight (8) hour work day, Dr. Thrasher found that Plaintiff could sit for four
10 (4) hours, but not stand for any period of time. *Id.* at 178-79.  Dr. Thrasher further found that
11 Plaintiff could frequently reach, handle, finger or feel, occasionally climb stairs and ramps,
12 stoop, and kneel, and never climb ladders or scaffolds, crouch or crawl.  AR at 179.  Dr.
13 Thrasher additionally found that Plaintiff could is restricted working around extremes in
14 temperature and dust, fumes or gases. *Id*.

15 State agency psychologist, Jaine Foster-Valdez, Ph.D., performed a mental residual
16 capacity assessment. *Id.* at 197.  Dr. Foster-Valdez found Plaintiff was not significantly
17 limited in the ability to understand and remember detailed instructions, and not limited at all
18 in the ability to remember locations and work-like procedures or the ability to understand and
19 remember very short and simple instructions. *Id.*  Dr. Foster-Valdez further found that
20 Plaintiff had no limitation in the ability to carry out very short and simple instructions; and
21 was not significantly limited in the ability to carry out detailed instructions, perform activities
22 within a schedule; the ability to maintain regular attendance, and be punctual within
23 customary tolerances; the ability to sustain an ordinary routine without special supervision;
24 the ability to work in coordination or proximity to others without being distracted by them;
25 the ability to make simple work-related decisions; the ability to complete a normal workday
26 and workweek without interruptions from psychologically based symptoms and to perform
27 at a consistent pace without an unreasonable number and length of rest periods; the ability

28

to interact appropriately with the general public; the ability to ask simple questions or request assistance; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; the ability to maintain socially appropriate behavioral and to adhere to basic standards of neatness and cleanliness; the ability to respond appropriately to changes in the work setting; the ability to be aware of normal hazards and take appropriate precautions; and the ability to travel in unfamiliar places or use public transportation. AR at 197-98. Dr. Foster-Valdez found Plaintiff moderately limited in the ability to maintain attention and concentration for extended periods and the ability to set realistic goals or make plans independently of others. *Id.* Dr. Foster-Valdez concluded that Plaintiff "is considered to be able to meet all of the basic mental demands of competitive, remunerative, unskilled work." *Id.* at 199. Dr. Foster-Valdez's Psychiatric Review Technique found Plaintiff to have both affective and somatoform disorders. *Id.* at 209. The affective disorder is noted as major depressive disorder, recurrent, chronic, severe, and the somatoform disorder is a pain disorder associated "with both Y factors and GMC[.]" *Id.* at 215. Upon reconsideration, Randall J. Garland, Ph.D. reviewed the records in this case. AR at 235. Dr. Garland affirmed Dr. Foster-Valdez's Psychiatric Review Technique Form ("PRTF") and Mental Residual Functional Capacity ("MRFC") form decision. *Id.*

On June 27, 2008, John Fahlberg, M.D. performed a Physical Residual Functional Capacity Assessment of Plaintiff. *Id.* at 201-08. Dr. Fahlberg notes that Plaintiff's Rheumatoid Arthritis diagnosis is by history only. *Id.* at 201. Dr. Fahlberg determined that Plaintiff could occasionally lift twenty (20) pounds and frequently lift ten (10) pounds. *Id.* at 202. Further Plaintiff could stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday and sit (with normal breaks) for a total of about 6 hours in an 8-hour workday. AR at 201. Dr. Fahlberg found Plaintiff is unlimited in her ability to push and/or pull (including operation of hand and/or foot controls). *Id.* Dr. Fahlberg further found Plaintiff's postural limitation as only occasionally climbing ladders, ropes and scaffolds;

however, Plaintiff could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. *Id.* at 203. Dr. Fahlberg determined that Plaintiff did not have any manipulative, visual or communicative limitations. *Id.* at 204-5. Dr. Fahlberg found Plaintiff's environmental limitations included avoiding concentrated exposure to extreme cold; vibration; fumes, odors, dusts, gases, and poor ventilation; and hazards, such as machinery and heights. *Id.* at 205. Dr. Fahlberg found Plaintiff was not limited in her ability to be exposed to extreme heat, wetness, humidity or noise. AR at 205. Dr. Fahlberg noted that Plaintiff alleged asthma and arthritis; however, there was no medical evidence of record or exam findings with these diagnoses. *Id.* Pursuant to a request by the Commissioner, Stephen S. Dickstein, M.D. reviewed and affirmed the Residual Functional Capacity determined by Dr. Fahlberg. *Id.* at 234.

On February 26, 2007, Plaintiff was seen by Candace Speakman, M.D., for polyarticular arthralgias, hypertension and chronic low back pain. *Id.* at 271. Dr. Speakman noted that Plaintiff still had "lots of stress re: caring for sick father." *Id.* Dr. Speakman also noted that Plaintiff complained of depression. AR at 271. On June 12, 2007, Plaintiff was seen at San Xavier Health Center for right knee discomfort. *Id.* at 191. The progress notes state that Plaintiff's rheumatoid arthritis "is well controlled[.]" *Id.* The assessment/plan indicates rheumatoid arthritis, lower back pain and trochanteric bursitis, with a referral to physical therapy "for core strengthening to address [lower back pain and] bursitis[.]" *Id.* Plaintiff was also referred to radiology for an L-spine and A/P pelvis. *Id.* On June 18, 2007, Plaintiff had radiographs of her lumbar spine and pelvis. AR at 195. Disc space heights were found to be normal and "significant arthritic changes [were] absent. *Id.* The report further stated that "[t]he lumbar vertebral body heights and alignment are normal[;] [l]ytic and blastic changes are absent[;] [t]he [sacroilliac] joints appear symmetric[;] [t]he pedicles appear normal[;] [t]here is no sign of spondylolysis, spondyiollsthesis nor scoliosis[.]" *Id.* The impression states a "[n]ormal lumbar spine study[,] [s]table from 8/5/02[,] [n]o radiographic evidence of rheumatoid arthritis." *Id.* Regarding the pelvis, the report states

that "[f]ractures, dislocations, bony erosions, bony sclerosis, and significant degenerative changes are absent[;] [t]here is symmetry to the appearance of hips and [sacroilliac] joints[;] both hip joint spaces appear normal[;] [b]ony lesions are absent." *Id.* This was a "[n]ormal AP pelvis study[, with] [n]o radiographic evidence of rheumatoid arthritis." AR at 195. On June 22, 2007, Plaintiff was again seen at San Xavier Health Center for abdominal pain and nausea without vomiting. *Id.* at 189. The progress notes indicated that Plaintiff stated having chronic depression, which began after her son was placed in juvenile. *Id.* Moreover, plaintiff was out of her pain medication. *Id.* Plaintiff was given prescriptions for Lexapro, Vicodin, Oxycodone, Flexeril and Omeproazole. *Id.*

In August 2007, Plaintiff was again seen as a walk-in at San Xavier Health Center. AR at 188. The records indicate that she "[s]leeps all of the time [and] poor appetite[.]" *Id.* Plaintiff was "totally shut down/not helpful [at] all[.]" *Id.* The purpose of the visit was noted as depression and chronic pain. *Id.* Between late August and early November 2007, Plaintiff was seen at San Xavier Health Center for severe degenerative joint disease in her lumbo-sacral spine, an issue with her upper palate, hypertension and Vitamin D deficiency. *Id.* at 187. The record indicates that her last Magnetic Resonance Imaging ("MRI") was in 2005. AR at 187. On November 7, 2007, Plaintiff had a MRI of her lumbar spine with contrast performed. *Id.* at 196. The findings indicated that the "[f]ive non-rib bearing lumbar vertebral bodies are presumed and demontstrate[] normal vertebral body height and alignment[, without] . . . marrow signal abnormality[,] [c]onus is unremarkable on sagittal images[, and] [t]he sacrum is not studied in detail." *Id.* Further, there was "facet degeneration bilaterally" at L5/S1, but "[n]o significant spinal stenosis or foraminal encroachment." *Id.* Additionally there was "moderate central stenosis related to facet degeneration, underlying disc bulge without significant nerve root encroachment" at L4/L5. *Id.* At L3/L4 mild stenosis was detected with a "small broad based left foraminal disc protrusion without significant spinal stenosis or nerve root encroachment." AR at 196.

On March 24, 2008, Plaintiff was seen by Dr. Speakman "[g]rief stricken over death

- 9 -

1  of her father for whom she was the primary caretaker." *Id.* Plaintiff was given Lorazepam
2  for sleep, her chronic medications were refilled, and she was urged to seek counseling. *Id.*
3  On June 28, 2008, Plaintiff was seen and diagnosed with a "[s]evere grief reaction" and
4  "back ain with bilateral leg numbness – no significant findings on MRI 11/07." *Id.* at 183.
5  Plaintiff was directed to see Dr. Speakman "once she has two or more sessions of
6  counseling" and that she "needs to see a pain specialist re: need to see if they had adjunct to
7  pain meds. Pt aware that she will need to decrease the # of pain meds she is taking in the
8  near future. Also consider PT." *Id.* at 183-84. On July 29, 2008, Plaintiff had a routine eye
9  exam. AR at 264-70. On August 22, 2008, Plaintiff was again seen by Dr. Speakman. *Id.*
10 at 263. Plaintiff stated that she had an upcoming counseling appointment, but had not been
11 motivated to do so sooner. *Id.* Dr. Speakman noted the high dosages of opiates that Plaintiff
12 was currently taking needed to be decreased, and that Plaintiff should consider physical
13 therapy or an orthopedic consult. *Id.* Dr. Speakman noted the purpose of the visit was
14 chronic back/hip pain, rheumatoid arthritis and depression. *Id.* On October 23, 2008,
15 Plaintiff was seen by Dr. Speakman to review her pain contract and with continued
16 complaints of low back and hip pain. AR at 260. Plaintiff reported not having received
17 counseling because sh lost her AHCCCS. *Id.* Dr. Speakman stated that she would recheck
18 all of Plaintiff's rheumatology labs "in [the] interest of making firm [diagnosis.]" *Id.* at 261.
19 Additionally, Plaintiff was instructed to keep her rheumatology appointment on October 29,
20 2008, to keep all counseling appointments, quit smoking and taper opiates to a reasonable
21 dose. *Id.* Dr. Speakman noted that she would continue to taper Plaintiff's med even if she
22 failed to keep an appointment. *Id.* at 262. On October 28, 2008, Plaintiff was seen at the
23 Rheumatology Clinic at San Xavier Health Center. AR at 259. The records reflect that her
24 medication dosage is high, and x-rays were ordered. *Id.* The same date, Plaintiff had x-rays
25 of her knees and hips. *Id.* at 254-55. "Two views of both knees showed no significant
26 abnormality." *Id.* at 254. Further, "[t]wo views of the pelvis in neutral and frogleg positions
27 showed no significant abnormality of the hips." *Id.* at 255. On November 4, 2008, Dr.
28

Speakman reviewed Plaintiff's labs which were negative for lupus and rheumatoid arthritis, although Dr. Speakman speculated that Plaintiff might have seronegative RA. AR at 249-53, 258-59. On December 16, 2008, Plaintiff was seen by Dr. Speakman on follow-up regarding the pain in Plaintiff's knees, back and feet. *Id.* at 256. Plaintiff complained of much pain, and stated that she had "increased her cigarette intake and drinking tea with cannibis from time to time because of the pain." *Id.* Plaintiff indicated that she was going to COPE for counseling. *Id.* Dr. Speakman questioned the rheumatoid arthritis and/or lupus diagnosis do to equivocal labs. *Id.* at 257. Dr. Speakman continued to decrease Plaintiff's pain medications and discussed possible ramifications of a positive urine screen for marijuana. *Id.* Dr. Speakman noted Plaintiff should continue going to COPE. AR at 257.

Plaintiff was seen at COPE Community Services, Inc. on August 27, 2008. *Id.* at 272-99, 331. The intake records reflect that Plaintiff went to COPE "to address her feelings of sadness, poor sleep patterns, grief and anxiety." *Id.* at 281; *see also id.* at 276. Plaintiff indicated that she drinks tea with marijuana occasionally for pain. *Id.* at 276-77, 299. The COPE mental status exam response indicated that Plaintiff was calm, depressed, affect appropriate to thought content, showed low self-esteem, slow speech, her thought process was logical, relevant, coherent, goal directed, her thought content was depressive, she was oriented to person, place time and situation, her memory was recent and remote, she was oriented to current events, and showed average intelligence, with good judgment and impulse control and good insight. *Id.* at 280-81. Plaintiff's diagnosis indicated depression not otherwise specified, anxiety state unspecified, episodic use cannabis abuse and alcohol abuse in remission. AR at 282. Plaintiff's Global Assessment of Functioning (GAF) score was 58, indicating moderate symptoms. *Id.* at 286. On September 18, 2008, COPE services left a message for Plaintiff who was unavailable. *Id.* at 328. On October 3 and 6, 2008, COPE followed up with Plaintiff telephonically regarding her AHCCCS. *Id.* at 324, 327. On October 29, 2008, Plaintiff called COPE seeking an earlier appointment. *Id.* at 323. On November 14, 2008, a COPE representative spoke with Plaintiff regarding her depression

1  and need for therapy. AR at 322. On November 21, 2008, Plaintiff was seen by Patricia
2  Joyce, N.P. at COPE. *Id.* at 318. Plaintiff "did not volunteer information freely, chart
3  reviewed to complete history[.]" *Id.* Nurse Joyce described Plaintiff as "[a]lert, poor eye
4  contact, anxious, tearful . . . fair grooming[,] [n]on-spontaneous in conversation, volunteered
5  little information, [a]ppears average level of intelligence with limited education[,] [m]emory
6  intact for recent and remote events[,] [t]hought process [c]lear, logical [and] goal directed[,]
7  . . . [j]udgment/[i]nsight fair." *Id.* Plaintiff's depression medication was changed to
8  Cymbalta. *Id.* On December 4, 2008, a late entry progress note was made indicating that
9  Plaintiff had not followed through with recommendations for individual therapy. *Id.* at 314.
10 On December 18, 2008, Plaintiff met with Linda Ratliff at COPE, and admitted that she
11 "recently has gone back to drinking." AR at 311. Plaintiff's Cymbalta prescription was
12 increased. *Id.* On January 22, 2009, Plaintiff did not attend her scheduled appointment. *Id.*
13 at 309. On August 17, 2011, Nurse Practitioner Joyce completed a Mental Residual
14 Functional Capacity Assessment. *Id.* at 334-35. According to this MRFC, Nurse Joyce
15 found Plaintiff to be markedly limited in her ability to understand and remember detailed
16 instructions, the ability to carry out detailed instructions, maintain attention and concentration
17 for extended periods, perform activities within a schedule, maintain regular attendance, and
18 be punctual within customary tolerance, sustain an ordinary routine without special
19 supervision, complete a normal workday and workweek without interruptions from
20 psychologically based symptoms and to perform at a consistent pace without an unreasonable
21 number and length of rest periods, accept instructions and respond appropriately from
22 supervisors and set realistic goals or make plans independently of others. AR at 334-35.
23 Nurse Joyce found Plaintiff not markedly limited in her ability to carry out very short and
24 simple instructions and be aware of normal hazards and take appropriate precautions. *Id.*
25 Nurse Joyce found Plaintiff varying degrees of limited, however did not provide further
26 detail, in regard to her ability to remember locations and work-like procedures, understand
27 and remember very short and simple instructions, walk in coordination with or proximity to
28

others without being distracted by them, make simple work-related decisions, interact appropriately with the general public, ask simple questions or request assistance, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, respond appropriately to changes in work setting, and travel in unfamiliar places or use public transportation. *Id.* Nurse Joyce indicated that Plaintiff had "[a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate." *Id.* at 335. Moreover, Plaintiff is estimated to be unable to work more than five (5) days per month due to mental illness. *Id.*

## II.     STANDARD OF REVIEW

The factual findings of the Commissioner shall be conclusive so long as they are based upon substantial evidence and there is no legal error. 42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). This Court may "set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).

Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance." *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003)); *see also Tackett*, 180 F.3d at 1098. Further, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007). Moreover, the court may not focus on an isolated piece of supporting evidence, rather it must consider the entirety of

1 the record weighing both evidence that supports as well as that which detracts from the
2 Secretary's conclusion. *Tackett*, 180 F.3d at 1098 (citations omitted).

## III.  ANALYSIS

The Commissioner follows a five-step sequential evaluation process to assess whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4). This process is defined as follows: Step one asks is the claimant "doing substantial gainful activity[?]" If yes, the claimant is not disabled; step two considers if the claimant has a "severe medically determinable physical or mental impairment[.]" If not, the claimant is not disabled; step three determines whether the claimant's impairments or combination thereof meet or equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. If not, the claimant is not disabled; step four considers the claimant's residual functional capacity and past relevant work. If claimant can still do past relevant work, then he or she is not disabled; step five assesses the claimant's residual functional capacity, age, education, and work experience. If it is determined that the claimant can make an adjustment to other work, then he or she is not disabled. 20 C.F.R. § 404.1520(a)(4)(i)-(v).

In the instant case, the ALJ found that Plaintiff was not engaged in substantial gainful activity since April 11, 2008, the application date. AR at 21. At step two of the sequential evaluation, the ALJ found that "[t]he claimant has the following severe impairments: rheumatoid arthritis; depression (20 CFR 415.920(c))." *Id.* At step three, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.920(d), 416.925 and 416.926)." *Id.* at 22. At step four, the ALJ noted Plaintiff does not have any past relevant work and found as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of sedentary work as defined in 20 CFR 416.967(b). The claimant used a cane in her right dominant hand to assist her when ambulating. The claimant can stand for up to 4 hours out of an 8 hour workday. The claimant has no

restrictions in sitting. The claimant may frequently reach, handle, finger or feel. The claimant is precluded from climbing ladders, robes and scaffolds. The claimant may only occasionally climb ramps or stairs, or stoop, kneel, crouch or crawl. The claimant should avoid concentrated exposure to temperature extremes, vibration, fumes, odors, dusts, gasses, poor ventilation and hazardous heights and machinery. The claimant is able to meet all of the basic mental demands of competitive, remunerative, unskilled work. The claimant is moderately limited in her ability to maintain attention and concentration for extended periods of time. The claimant is moderately limited in her ability to make plans or set goals independently of others. The claimant is able to understand, remember and carry out simple instructions, to make simple work related decisions, maintain a simple schedule and complete simple tasks on a consistent basis. The claimant is able to work with and around others. The claimant is able to deal with changes in a routine work setting.

*Id.* at 24. At step five, the ALJ determined that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the regional economy that the claimant can perform (20 CFR 416.969 and 416.969(a)). *Id.* at 27. Ultimately, the ALJ decided that "the claimant has not been disabled within the meaning of the Social Security Act, since April 11, 2008, the date the applications was filed (20 CFR 416.920(g))." *Id.* Plaintiff asserts that the ALJ erred in his RFC assessment by 1) mischaracterizing Dr. Rohen's opinion, 2) giving little weight to Dr. Foster-Valdez's PRTF, and 3) finding Plaintiff not fully credible. Pl.'s Opening Brief (Doc. 21) at 1-22.

### A.     *Plaintiff's Credibility*

"To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis." *Lingenfelter v. Astrue*, 204 F.3d 1028, 1035-36 (9th Cir. 2007). First, "a claimant who alleges disability based on subjective symptoms 'must produce objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged[.]'" *Smolen v. Chater*, 80 F.3d 1273, 1281-82 (9th Cir. 1996) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (*en banc*) (internal quotations omitted)); *See also Lingenfelter*, 504 F.3d at 1036. Further, "the claimant need not show that [her] impairment could reasonably be expected to cause the severity of the symptom [she] has alleged; [she] need only show that

- 15 -

1  it could reasonably have caused some degree of the symptom." *Smolen*, 80 F.3d at 1282
2  (citations omitted).  "[I]f the claimant meets this first test, and there is no evidence of
3  malingering, 'the ALJ can reject the claimant's testimony about the severity of [her]
4  symptoms only by offering specific, clear and convincing reasons for doing so.'"
5  *Lingenfelter*, 504 F.3d 1028 (quoting *Smolen*, 80 F.3d at 1281). "Factors that an ALJ may
6  consider in weighing a claimant's credibility include reputation for truthfulness,
7  inconsistencies in testimony or between testimony and conduct, daily activities, and
8  'unexplained, or inadequately explained, failure to seek treatment or follow a prescribed
9  course of treatment.'" *Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007) (quoting *Fair v.
10 Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)).

11 Here, the ALJ found that "the claimant's medically determinable impairments could
12 reasonably be expected to cause the alleged symptoms[.]" AR at 24. As such, Plaintiff has
13 met the first step. *See Smolen*, 80 F.3d at 1281-82. The ALJ further states that "the
14 claimant's statements concerning the intensity, persistence and limiting effects of these
15 symptoms are not credible to the extent they are inconsistent with the above residual
16 functional capacity assessment." AR at 24. The ALJ pointed to the x-rays of Plaintiff's
17 lumbar spine and pelvis performed in June 2007 which found no radiographic evidence of
18 rheumatoid arthritis. *Id.*; *see* AR at 195. The ALJ also noted the additional radiographs
19 performed in October 2008 which found no significant abnormalities. *Id.* at 25; *see* AR at
20 254-55. The ALJ further noted the negative blood tests for rheumatoid arthritis and lupus.
21 *Id.*; *see* AR at 249-53, 258-59. All of these objective findings support the ALJ's adverse
22 credibility finding regarding Plaintiff's subjective pain. *See Parra v. Astrue*, 481 F.3d 742,
23 750 (9th Cir. 2007) (holding inconsistencies between claimant's subjective pain testimony
24 and objective findings in the medical record constitutes significant and substantial reasons
25 to find claimant's testimony less than completely credible).

26 The ALJ also found "the claimant less than credible with respect to the extent to
27 which her impairments prevent her from engaging in work related activities." AR at 26. The

1  ALJ determined that "the claimant's activities of daily living indicate the ability to function
2  at a high level." *Id.* Specifically, "[t]he claimant . . . reported that she worked as a personal
3  caregiver for her father at home from 1984 through 2008, 24 hours a day, 7 days a week."
4  *Id.*; *see also* AR at 121-22. This care included preparing meals, interacting with him, helping
5  him bathe, shave, clean his clothing and lifting him when he fell, and ended when her father
6  passed away. *Id.* at 26; *see also* AR at 122. The ALJ found that "[t]hese activities are
7  certainly indicative of a high level of functioning and also indicate that the claimant is
8  capable of performing work related activities." *Id.* at 26. This finding is consistent with the
9  objective medical record. *See Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) ("if a
10 claimant engages in numerous daily activities involving skills that could be transferred to the
11 workplace, the ALJ may discredit the claimant's allegations upon making specific findings
12 relating to those activities." *Id.* (citations omitted)). Accordingly, this Court concludes that
13 the ALJ stated sufficient specific reasons for not fully crediting Plaintiff's testimony.

### B.     Dr. Rohen's Opinion

15      Plaintiff asserts that "the opinions of examining psychologist Rohen were not as the
16 ALJ characterized them." Pl.'s Opening Brief (Doc. 21) at 13. The ALJ stated that he
17 "[gave] great weight to the opinion of Doctor Rohen, who performed a psychiatric
18 consultative examination[.]" AR at 26. Plaintiff agrees that this was appropriate. Pl.'s
19 Opening Brief (Doc. 21) at 13. The ALJ further stated that "Doctor Rohen's opinion that the
20 claimant was capable of performing work despite the limitations imposed by her mental
21 impairments is well supported by the objective medical evidence of record and by the
22 claimant's high level of functioning as demonstrated by her activities of daily living." AR
23 at 26. Moreover, although "the claimant was found to exhibit a flat affect and lack of
24 spontaneity, . . . no other impairments to the claimant's social interaction were noted." *Id.*
25 The ALJ further found this to be consistent with Dr. Foster-Valdez's mental residual
26 functional capacity assessment. *Id.* Additionally, the ALJ fully summarized Dr. Rohen's
27 examination and opinion regarding Plaintiff's memory and understanding, mild attentional

- 17 -

difficulties, and the negative impact of her father's death on her ability to change. *Id.* at 25.

Plaintiff argues that Dr. Rohen's opinions are supported by the evidence and "clearly inconsistent with the ALJ's characterization as supporting a denial of disability." Pl.'s Opening Brief (Doc. 21) at 14. In furtherance of her arguments, Plaintiff relies on the August 2011 MRFC prepared by Nurse Practitioner Joyce. *Id.* at 13; *see* AR at 333-35. As an initial matter, nurse practitioners are not acceptable medical sources for the establishment of a medically determinable impairment. 20 C.F.R. § 416.913(a). Moreover, when Nurse Practitioner Joyce saw Plaintiff at COPE on November 21, 2008, she described Plaintiff as "[a]lert, poor eye contact, anxious, tearful . . . fair grooming[,] [n]on-spontaneous in conversation, volunteered little information, [a]ppears average level of intelligence with limited education[,] [m]emory intact for recent and remote events[,] [t]hought process [c]lear, logical [and] goal directed[,] . . . [j]udgment/[i]nsight fair." AR at 318. This was the only meeting between Nurse Practitioner Joyce and Plaintiff in the medical record, and Nurse Practitioner Joyce's findings were much less severe than her MRFC. *See* 20 C.F.R. § 404.1527(c)(2)(i) ("the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."); *see also* 20 C.F.R. § 404.1527(c)(4) ("the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."). Additionally, Nurse Practitioner Joyce's MRFC contained two check boxes, "not markedly limited" and "markedly limited." *Id.* at 334-35. Ten (10) of the twenty (20) responses given were somewhere in between these two boxes, and without further explanation. *Id.*; *see Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996) ("The ALJ . . . permissibly rejected [the psychological evaluations] because they were check-off reports that did not contain any explanation of the bases of their conclusions." *Id.*). Therefore, despite Plaintiff's assertions to the contrary, Nurse Joyce's MRFC does not alter the fact that substantial evidence supports the ALJ's characterization of Dr. Rohen's opinions and his decision.

. . .

- 18 -

### C. Dr. Foster-Valdez's PRTF

Plaintiff asserts that the ALJ improperly discounted the PRTF opinion of nonexamining psychologist Dr. Foster-Valdez indicating "moderate" impairments "in the areas of (a) maintaining social function, and (b) maintaining concentration, persistence, or pace." Pl.'s Opening Brief (Doc. 21) at 18. The Commissioner asserts that "these 'check-box' forms are part of the "B" Criteria used in determining whether a claimant meets a mental impairment listing, 20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.00(A), which Plaintiff did not meet because she did not have any marked limitations." Def.'s Opp. to Pl.'s Opening Brief (Doc. 27) at 16 n.4. As the Commissioner further explains, Section III of the Mental RFC form is where "the actual mental RFC assessment is recorded." Program Operations Manual System ("POMS") DI 24510.060; Def.'s Opp. to Pl.'s Opening Brief (Doc. 27) at 16 n.4. The Court finds that the ALJ did not err in his assessment of nonexamining psychologist Dr. Foster-Valdez's opinions. The Court further finds that substantial evidence supported his determinations.

## IV. CONCLUSION

In light of the foregoing, the Court affirms the Commissioner's decision.

Accordingly, IT IS HEREBY ORDERED that:

1) Carolyn W. Colvin, Acting Commissioner of Social Security, is **substituted as Respondent** for Michael Astrue pursuant to Rule 25(d) of the Federal Rules of Civil Procedure;

2) Plaintiff's Opening Brief (Doc. 21) is DENIED;

3) The Commissioner's decision is AFFIRMED;

4) The Clerk of the Court shall enter judgment, and close its file in this matter.

DATED this 30th day of September, 2013.

_____
Bruce G. Macdonald
United States Magistrate Judge